DEBORAH CONNOR, Acting Chief
Money Laundering and Asset Recovery Section (MLARS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
JONATHAN BAUM, Trial Attorney
BARBARA LEVY, Trial Attorney
Criminal Division
United States Department of Justice
    1400 New York Avenue, N.W., 10th Floor
    Washington, D.C. 20530
    Telephone: (202) 514-1263
    Email:  Woo.Lee@usdoj.gov

NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
JONATHAN GALATZAN (CBN: 190414)
Assistant United States Attorneys
Asset Forfeiture Section
    312 North Spring Street, 14th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-3391/(213) 894-2727
    Facsimile: (213) 894-7177
    Email: John.Kucera@usdoj.gov
           Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>                  v.<br><br>"THE WOLF OF WALL STREET" MOTION PICTURE, ETC.,<br><br>             Defendant. | No. CV 16-5362-DSF (PLAx)<br>No. CV 17-4439-DSF (PLAx)<br><br>**STIPULATION AND REQUEST TO ENTER CONSENT JUDGMENT OF FORFEITURE**<br><br>[[PROPOSED] Consent Judgment Lodged Contemporaneously Herewith] |

UNITED STATES OF AMERICA,

       Plaintiff,

          v.

"DADDY'S HOME" AND "DUMB AND DUMBER TO" MOTION PICTURES, ETC.,

       Defendants.

Plaintiff United States of America (the "Government" or the "United States") and claimants and potential claimants Red Granite Pictures, Inc. ("Red Granite Pictures"); Red Granite Capital, Ltd.; Red Granite Capital US LLC; TWOWS LLC; Red Granite International, Inc.; Red Granite Entertainment Holdings, LLC; DDTo Finance, LLC; Dumb and Dumber To, LLC; RGDD2 Productions, LLC; and Daddy's Home LLC (collectively, the "Red Granite Claimants," and with the Government, the "Parties") by and through their counsel of record, stipulate and request that this Court enter the proposed consent judgment lodged concurrently herewith to carry into effect this settlement (the "Agreement") reached between the Parties.

    1.    The Red Granite Claimants assert an interest in any and all rights, presently-held and future, in the motion pictures "The Wolf of Wall Street," "Daddy's Home," and "Dumb and Dumber To" belonging to Red Granite Pictures, Inc. (the "Defendant Assets"), as described more completely in the operative complaints in case numbers 16-cv-5362-DSF (PLAx) and 17-cv-04439-DSF (PLAx) (the "Actions").

    2.    This Court has jurisdiction over the Actions pursuant to 28 U.S.C. §§ 1345 and 1355.

1    3.    The operative complaints in the Actions assert claims

2    pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

3    4.    The Government has given and published notice of these

4    actions as required by law, including Rule G of the Supplemental

5    Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions,

6    Federal Rules of Civil Procedure, and the Local Rules of this Court.

7    The Red Granite Claimants have filed timely claims in "The Wolf of

8    Wall Street" ("TWOWS") action (16-cv-5362-DSF (PLAx)).  The Screen

9    Actors Guild-American Federation of Television and Radio Artists;

10   Writers Guild of America West, Inc.; Motion Picture Industry Pension

11   and Health Plans; and Directors Guild of America, Inc. (collectively,

12   "the Union Entities"), have timely filed claims and an answer to the

13   original complaint filed in the TWOWS action (16-cv-5362-DSF (PLAx)).

14   No other claims have been filed, and the time for filing claims and

15   answers in case number 16-cv-5362-DSF (PLAx) has expired.[1]   Any

16   potential claimants to the Defendant Assets other than the Red

17   Granite Claimants and the Union Entities are deemed to have admitted

18   the allegations of the complaint with respect to the Defendant

19   Assets.

20   5.    For purposes of this consent judgment, the term "Red

21   Granite" is defined to include, collectively and individually:  Red

22   Granite Pictures, Inc.; Red Granite International, Inc.; Red Granite

23   Capital Ltd.; Red Granite Partners, Inc.; Red Granite Capital US,

24

25

26   [1] The deadline to file claims in case number 16-cv-5362-DSF
     (PLAx) expired on December 29, 2016, and the only individuals and/or
27   entities to file claims are the Red Granite Claimants and the Union
     Entities.  The deadline to file claims in case number 17-cv-04439-DSF
28   (PLAx) has not yet expired with respect to the Red Granite Claimants,
     the Union Entities, and Paramount Pictures Corporation.

3

LLC; Red Granite Music, LLC; Red Granite Investment Holdings, LLC;
Red Granite Real Estate Holdings, LLC; Red Granite Entertainment
Holdings, LLC; Red Granite Entertainment, Inc.; RG Productions
Development, LLC; DDTo Finance, LLC; RGDD2 Productions, LLC; Dumb and
Dumber To, LLC; TWOWS, LLC; The Papillon Project, LLC; Papillon Movie
LLC; Papillon Movie Finance LLC; Daddy's Home, LLC; Daddy's Home
Finance, LLC; OOTF, LLC; The Horns Project, Inc.; Victory or Death,
LLC; The Horns Project Productions Ltd.; Blue Box International LLC;
and Metropolis IX Capital Advisors, LLC, as well each of their
predecessors, successors, assigns, subsidiaries, parent companies,
and affiliated entities.

6.    Nothing in this Agreement or the proposed consent judgment
is intended to be or constitutes an admission of wrongdoing or
liability on the part of Red Granite, its Shareholders (as defined
below), or the Union Entities, nor can this Agreement or any consent
judgment entered pursuant to this Agreement be admissible against Red
Granite, its Shareholders, or the Union Entities in any proceeding as
evidence of any of the allegations set out in the operative
complaints in the Actions.

7.    Red Granite and the Government consent to the terms of this
Agreement and agree to take all reasonable steps necessary to execute
its terms.

Forfeiture Amount

8.    In consideration of this Agreement, Red Granite shall:

a.    Pay the amount of $60,000,000.00 as substitute *res* for
the Defendant Assets (the "Forfeiture Amount") in a manner consistent
with the terms of this Agreement, and agrees to forfeit to the
Government all rights, title, and interest in the Forfeiture Amount.

4

1        b.   In connection with any and all funds Red Granite
2   intends to provide to satisfy any portion of the Forfeiture Amount,
3   Red Granite shall identify the source of those funds and provide to
4   the Government sufficient information to satisfy the Government as to
5   the legitimacy of any and all sources of such funds, other than funds
6   already in the possession of or held for the benefit of Red Granite
7   (*e.g.,* the "Paramount Funds," as defined below).
8        c.   Within ten [10] business days from the Court's entry
9   of the proposed consent judgment, Paramount Pictures Corporation
10  ("Paramount") shall transfer to the Government, or cause to be
11  transferred to the Government, all funds in Paramount's possession or
12  control on that date that, as shown on the most recent participation
13  statement issued by Paramount, are due from Paramount to Red Granite
14  Capital US, LLC from the motion picture "Daddy's Home" (the
15  "Paramount Funds").  The Government shall hold the Paramount Funds in
16  an interest-bearing account, subject to paragraph 8(d)(i), below.
17       d.   Pursuant to paragraphs 39 and 42(c), below, Paramount
18  shall pay directly to Red Granite Capital US, LLC, Red Granite
19  Pictures, Inc., or their assign, any funds that, as shown on the
20  quarterly or annual (as applicable) statements issued by Paramount
21  after the date of the transfer to the Government prescribed in
22  paragraph 8(c), become due from Paramount to Red Granite from the
23  motion picture "Daddy's Home".  Red Granite shall hold, and not
24  expend nor disburse, such funds, including as Collateral (as that
25  term is defined in paragraph 17, below), until such time as either
26  (a) Red Granite satisfies the entire Forfeiture Amount, or (b) the
27  Government consents in writing to Red Granite's use of such funds.
28       e.   The Forfeiture Amount shall be payable as follows:

i. "First Payment": No later than 30 days after the proposed consent judgment is entered by the Court, subject to Paramount's timely compliance with the requirements of Paragraph 8(c), above, Red Granite shall be deemed to have paid the Government an amount equal to $30 million (or more, at Red Granite's sole election) from the Paramount Funds, which the Government may thereafter transfer as it deems appropriate;

ii. "Second Payment": No later than 180 days after the Government receives the payment of the $30 million described in the "First Payment," Red Granite shall pay to the United States an additional $20 million. In the event that Red Granite has chosen to pre-pay any portion of the Forfeiture Amount as of the date that the Second Payment is due, the Second Payment shall be in an amount such that Red Granite has paid the Government a total of at least $50 million, plus applicable interest as set forth below; and

iii. "Third Payment": No later than 180 days after the Government receives the "Second Payment," Red Granite shall pay to the United States an amount no less than $10 million. In the event that Red Granite has chosen to pre-pay any portion of the Forfeiture Amount as of the date that the Third Payment is due, the Third Payment shall be in an amount such that Red Granite has paid the Government a total of $60 million, plus applicable interest as set forth below (*i.e.*, the entire Forfeiture Amount);

iv. From the date of the Court's entry of the proposed consent judgment, Red Granite shall pay the Government 2% interest per annum on any unpaid portion of the Forfeiture Amount, which shall be payable in addition to and at the same time as the payment schedules in (i) – (iii) above. Thirty (30) days prior to

the date that each of the Second Payment and the Third Payment is
due, the Parties shall calculate the amount of interest due and
confirm in writing the total amount due and owing for such payment.

v.    For the avoidance of doubt, Red Granite may
prepay any portion of the Forfeiture Amount without accruing interest
thereon or incurring any other prepayment penalty.

9.    Should Red Granite not make full payments in accordance
with the terms set forth herein, the Government may declare an event
of default.  Should the Government declare such a default, it shall
provide written notice to Red Granite, with a copy to the Union
Entities, and allow Red Granite seven (7) business days to cure any
such default.  Following this seven-day period, should Red Granite
not fully cure the default, the Government may immediately accelerate
the payment schedule for the entire remainder of the Forfeiture
Amount not then paid.

10.    Immediately following the First Payment (*i.e.*, the $30
million payment to the Government from the Paramount Funds), the
Government shall cause $3 million to be paid from the Paramount Funds
to Red Granite, to an account designated in writing by counsel to Red
Granite.  In this Agreement, the amount of the Paramount Funds that
remains on deposit with the Government after (i) the First Payment
has been made to the Government and (ii) the initial $3 million has
been distributed directly to Red Granite, shall be known as the
"Remainder Funds."

11.    The Parties intend that the $3 million from the Paramount
Funds that is paid directly to Red Granite pursuant to the preceding
Paragraph is an amount roughly sufficient to cover Red Granite's
normal operating expenses and disclosed obligations through the date

that the Second Payment is due.  Notwithstanding Red Granite's best
efforts to project that $3 million will be an amount sufficient to
cover Red Granite's normal operating expenses and disclosed
obligations until the Second Payment is due, within ten [10] business
days upon written application by Red Granite to a "Control Group"
that the Government will specifically identify and promptly make
known to Red Granite prior to final execution of this Agreement, the
Government shall release to Red Granite such portion of the Remainder
Funds as are necessary to pay for obligations incurred by Red Granite
prior to the date of this Agreement, and which have been disclosed to
the Government.

12.  Thirty [30] days prior to the due date of the Second
Payment, Red Granite may provide to the Government a schedule of
normal operating expenses and disclosed obligations that Red Granite
has undertaken to pay during the 180 day period following the Second
Payment, which the Government shall release as set forth in Paragraph
11 above, *i.e.*, within ten [10] business days upon written
application by Red Granite to the "Control Group," the Government
shall release to Red Granite such portion of the Remainder Funds as
are necessary to pay for Red Granite's scheduled normal operating
expenses and disclosed obligations over the 180 days period following
the due date of the Second Payment.  Notwithstanding the foregoing,
however, the Government shall have no obligation to release
additional Remainder Funds to Red Granite under this paragraph if (a)
Red Granite determines to raise funds to make the Second Payment by
selling or entering into a new borrowing agreement secured by the
Defendant Assets (a "Covered Transaction"), *and* (b) by the due date
of the Second Payment, Red Granite is unable to enter into a Covered

Transaction, *and* (c) Red Granite has not otherwise made the Second Payment.  If a Covered Transaction is scheduled to close, but has not yet closed, at the time that the Second Payment is due (and Red Granite has not otherwise made the Second Payment), the Government shall release to Red Granite such portion of the Remainder Funds as are necessary to pay for ordinary course obligations through two weeks following the date of the scheduled closing of such Covered Transaction.  For purposes of this Agreement, Red Granite shall be deemed unable to enter into a Covered Transaction if it has contacted (or affirmatively declined to contact) customary lenders and buyers in the market for motion picture assets or revenue streams, as well as non-traditional buyers in the capital markets (such as hedge funds or private equity funds), none of which has made a firm commitment to enter into a Covered Transaction.

13.  In addition, within ten [10] business days upon written application by Red Granite, the Government may release to Red Granite such portion of the Remainder Funds as are necessary to pay for other ordinary course expenses or to fund transactions outside of Red Granite's ordinary course, as defined below.  The Government's consent to release such funds may not be unreasonably withheld.  To the extent that there is a disagreement about whether any such expense is appropriate, the Parties shall meet and confer, and any disputes shall be brought to the Court for decision.  Red Granite shall be responsible for the reasonable costs of any professional services that the Government, in its sole discretion, believes necessary for it to make a reasonably informed decision concerning the release of Remainder Funds for any proposed non-ordinary course transaction.

14.   For the avoidance of doubt, non-ordinary course transactions within the meaning of Paragraph 13, above, include, but are not limited to the following:

a.   Sale or transfer of ownership interest in any Red Granite entity or affiliate, except as set forth in Paragraphs 17-22, below.

b.   Payment of dividends or distributions to shareholders other than salaries, *provided, however*, that Riza Aziz (the "Majority Shareholder") shall continue to draw no salary (other than the minimum required in order to ensure continuity of health insurance coverage under Red Granite's plan) until the Forfeiture Amount has been paid in full, as he has done voluntarily during the pendency of these Actions.

c.   Issuance or repurchase of equity shares, except as set forth in Paragraphs 17-22, below.

d.   Entering into new loan facilities, except as set forth in Paragraphs 17-22, below.

e.   Acquiring capital assets of a value greater than $50,000.00.

f.   Selling or otherwise disposing of assets, except as set forth in Paragraphs 17-22, below.

15.   At any time, and upon Red Granite's written notice to the Government, Red Granite may apply all or part of the Remainder Funds towards partial or full satisfaction of the Forfeiture Amount.

16.   Following payment in full of the Forfeiture Amount, the Government shall release to Red Granite that portion of the Remainder Funds (and any interest earned thereon) not already distributed to Red Granite or paid to the Government.

<u>Security Interest</u>

17.   To secure the Forfeiture Amount, Red Granite shall grant to the United States a General Business Security Interest and a pledge of all copyrights and other after-acquired property, subordinated only to existing valid, perfected security interests (the "Collateral"), *provided*, *however*, that the Collateral shall not include Red Granite's development assets, as identified to the Government (the "Excluded Development Assets"), *provided further*, *however*, that the Collateral shall include Red Granite's rights to proceeds, in any form, from the Excluded Development Assets.  The Parties shall insure that the security interest granted to the United States under this Paragraph is consistent with Red Granite's existing contractual obligations, including, but not limited to, and in furtherance of Paragraph 33 below, customary Union Entity lien priority and inter-creditor arrangements in connection with motion pictures produced or distributed by Red Granite that are produced subject to Union Entity contracts, including motion pictures derived from Excluded Development Assets.

18.   Notwithstanding anything in this Agreement to the contrary, Red Granite may, in its sole discretion, sell or borrow against the Collateral (in whole or in part) under the following circumstances:

     a.   All proceeds from any such sale or borrowing shall be paid to the Government in satisfaction of the Forfeiture Amount, except

     b.   If and only if Red Granite has paid the first two installments of the Forfeiture Amount (*i.e.*, a total of $50 million), Red Granite may retain the proceeds of any such sale or borrowing in amount of no more

than $5 million, to be used exclusively for
development and overhead.  Any additional proceeds of
such sale or borrowing shall be paid to the Government
in satisfaction of the Forfeiture Amount, regardless
of whether such monies are due and owing under this
Agreement yet.

c.   In the event that Red Granite retains any funds from a
sale of or borrowing against the Collateral pursuant
to paragraph 18(b), above, Red Granite shall grant to
the United States an additional security interest in
Red Granite's rights to the proceeds from any
development asset financed with such funds.

19.   Upon written consent of both Parties, other assets may be
substituted for some or all of the Collateral.

20.   The entirety of this Agreement shall be with recourse to
the Majority Shareholder in his personal capacity, and the Majority
Shareholder shall personally guarantee Red Granite's payment
obligations (described in Paragraphs 8-16, above) and the Majority
Shareholder shall pledge all of his assets in whatever form held, of
any type and wherever located (the "Majority Shareholder Assets"), to
the full satisfaction of Red Granite's obligation to pay the
Forfeiture Amount.

21.   Red Granite and the Majority Shareholder shall execute such
documentation as may be reasonably necessary in order to effectuate
and perfect the security interests and pledge of the Majority
Shareholder Assets.

22.   For the avoidance of doubt, and notwithstanding anything to
the contrary in this Agreement, nothing in this Agreement shall

entitle the Government to any amount of money greater than the Forfeiture Amount (plus all applicable interest).

Release of Property

23.   In consideration for the payment of the Forfeiture Amount, the United States agrees to abandon its claims to forfeit the Defendant Assets.

Surrender of Rights

24.   The Parties request that the Court find that upon full payment to the Government of the Forfeiture Amount, any and all potential claimants who had standing to file claims against the Defendant Assets but did not, including secured creditors such as Aabar Investments PJS Limited, be deemed to have surrendered all rights, title, and interest in the Defendant Assets.  For the avoidance of doubt, neither the Union Entities nor Paramount have surrendered any right, title, or interest they may have in the Defendant Assets, if any.

No Interference

25.   Red Granite shall not file, or cause any other person or entity to file, or assist any other person or entity in filing, any claim to the Forfeiture Amount or the Defendant Assets, or in any way interfere with or delay the forfeiture of the Forfeiture Amount.

26.   Upon request of the Government, Red Granite agrees to reasonably cooperate with the Government in connection with responding to any claims asserted against the Forfeiture Amount or the Defendant Assets. Nothing in this paragraph shall require Red Granite to waive attorney-client privilege, the work product doctrine, or any other privilege, immunity, or statutory or constitutional right or protection.

<u>No Admission of Liability/No Tax Refund</u>

27.   This Agreement does not constitute an admission of liability or fault on the part of Red Granite.

28.   Notwithstanding any other provision of this Agreement, the payment of the Forfeiture Amount does not constitute a fine, penalty, or punitive damages, *provided, however*, that the Forfeiture Amount shall be forfeited in its entirety to the Government, and shall not be claimed as a deduction or write-off for tax purposes.

<u>Release of Civil Claims</u>

29.   The Parties hereby fully and finally compromise, settle, release, and dispose of the following (collectively, the "Settled Claims"):

> a.   Any and all civil claims, including under the asset forfeiture or money laundering statutes, that the Government has asserted or could assert in connection with alleged violations arising out of the specified unlawful activity alleged in the Verified Complaints for Forfeiture In Rem in the Actions (the "Complaints"), or any other offenses arising from or related to the events and acts described in the Complaints, including any offenses having to do with 1MDB in any way (the "Covered Conduct"), against any of the following people, entities, or property:
>
> > i.   Red Granite, as defined above.
> >
> > ii.  Red Granite's officers, directors, employees, shareholders, and agents, who were employed by Red Granite on or before September 14, 2017, whose identities and roles were disclosed

explicitly to the Government prior to the execution of this Agreement.  The release provided in this sub-paragraph is limited to such people's work in connection with Red Granite, and does not release such people in connection with their work with or for any other entity or person.

iii.  Any ownership interest in Red Granite held by its shareholders, which was held on or before September 14, 2017, and which Red Granite disclosed explicitly to the Government prior to the execution of this Agreement, *provided, however*, that the pledge of Majority Shareholder Assets described in Paragraphs 20-21, above, shall include the Majority Shareholder's ownership interests in Red Granite;

iv.  Any property, real, personal, or intangible (including intellectual property) in the custody, control, or possession of Red Granite as of September 14, 2017, and that Red Granite disclosed explicitly to the Government prior to the execution of this Agreement, and the proceeds of such property;

v.  Any property derived from Red Granite's intellectual property, including future works based on that intellectual property and the proceeds payable from such works, that Red Granite owned on or before September 14, 2017,

15

and disclosed explicitly to the Government prior
to the execution of this Agreement;

vi.   Any property in the custody, control, or
possession of any other person or entity that was
received from Red Granite, including but not
limited to payments made pursuant to agreements
concerning motion picture proceeds, on or before
September 14, 2017, and disclosed explicitly to
the Government prior to the execution of this
Agreement.

vii.   Current and future proceeds payable to Red
Granite from motion pictures, including but not
limited to "The Wolf of Wall Street," "Friends
With Kids," "Dumb and Dumber To," "Horns," "Out
of the Furnace," "Daddy's Home," and "Papillon,"
as well as any projects of any kind (motion
picture, television, or otherwise) under
development or which Red Granite may be involved
in developing in the future.

viii.   For the avoidance of doubt, the releases provided
in this Agreement shall not include any asset
that is currently subject to a civil forfeiture
claim by the Government in any of the related
cases pending in this District, other than the
Defendant Assets.

b.   Any and all claims or defenses that Red Granite may or
could assert against the Government, including its
agencies, agents, officers, employees and

16

representatives, including, without limitation, all agents, officers, employees and representatives of the Federal Bureau of Investigation, the Internal Revenue Service, Criminal Investigation, as well as all agents, officers, employees and representatives of any state or local government or law enforcement agency involved in the investigation of this matter, related to the Covered Conduct or the Complaints, including any claims for reimbursement of funds expended on the Information Agent or Independent Operational Fiduciary, as those terms have been defined in prior orders of the Court.

30. Prior to the execution of this Agreement, Red Granite has provided to the Government a list of all assets to be released as part of the Settled Claims. Any material asset not so identified shall not be released.

31. With respect to the Settled Claims enumerated in Paragraphs 29 and 30, the Parties acknowledge and agree that the releases they give to each other upon executing this Agreement, subject and pursuant to Paragraphs 29 and 30 above, apply to all such claims known or unknown, foreseen, or patent or latent which either Party may have against the other, and each Party thereby waives application of California Civil Code Section 1542.

a. The Parties certify that they have read the following provisions of California Civil Code Section 1542:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF

1            EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM

2            OR HER MUST HAVE MATERIALLY AFFECTED HIS OR

3            HER SETTLEMENT WITH THE DEBTOR."

4       and indicate that fact by signing their initials

5       here:  JJK / MLS  .

6     b. Each Party understands and acknowledges that the

7        significance and consequences of this waiver of

8        California Civil Code Section 1542 is that even if it

9        should eventually suffer additional damages or identify

10       additional claims arising out of the subject matter of

11       the Settled Claims set forth in Paragraph 29, it will

12       not be able to seek any such damages or make any such

13       claim. Furthermore, the Parties acknowledge that they

14       intend these consequences even as to claims that may

15       exist as of the date of this release but which the

16       Parties do not know exist, and which, if known, would

17       materially affect each Party's decision to execute this

18       release, regardless of whether each Party's lack of

19       knowledge is the result of ignorance, oversight, error,

20       negligence, or any other cause.

21     c. However, for the avoidance of doubt, notwithstanding any

22       provision in this Agreement to the contrary, the Parties

23       acknowledge and agree that the Settled Claims described

24       in Paragraphs 29 and 30 embody exclusively the scope of

25       the claims compromised, settled, released and disposed

26       of under this Agreement and nothing in Paragraph 31

27       shall be read either to expand, increase, modify or

28       alter the scope or nature of the Settled Claims of any

1     kind enumerated in Paragraphs 29 and 30.

2   32.   Nothing in this Agreement shall be read to release any

3 potential criminal claims of any kind against any person or entity.

4 <u>Union Entities Claims</u>

5   33.   Notwithstanding the foregoing, nothing in this Agreement

6 shall be construed to affect, release, or impair any existing or

7 future rights or claims that the Union Entities may have with respect

8 to motion pictures produced, distributed, or otherwise exploited by

9 Red Granite, which claims shall pass through unaffected by the

10 Agreement.

11 <u>Hold Harmless</u>

12   34.   With regard to the Covered Conduct, the United States

13 agrees to hold harmless any financial institution, as defined under

14 Title 31, Section 5312(a)(2), in connection with providing ordinary-

15 course banking services to Red Granite, including, without

16 limitation: providing access to or opening deposit accounts,

17 custodial accounts, investment accounts, check clearing or processing

18 services, wire transfer services, and secured or unsecured lending.

19 For the avoidance of doubt, with regard to the Covered Conduct, the

20 United States agrees to hold harmless under this paragraph any such

21 financial institution, or any other entity in the business of

22 extending credit for motion pictures, for engaging in secured or

23 unsecured lending agreements with Red Granite in connection with

24 motion pictures that are under development or in production at the

25 time of this Agreement, or that come under development or enter into

26 production in the future.  As used in this sub-paragraph, an entity

27 is "in the business of extending credit for motion pictures" if it

28 has been in the principle business of motion picture finance for at

least the 36 months period preceding the date of any proposed
transaction and has an established history of financing motion
pictures that were released in the United States.  With respect to
any other potential source of film financing (*i.e.*, from a source
other than a financial institution or an entity in the business of
extending credit for motion pictures, as defined herein), the
Government may in its sole discretion, upon request by either Red
Granite or the potential source of film financing, confirm that a
financing transaction is subject to the hold harmless provision of
this sub-paragraph if Red Granite identifies the source of those
funds and provides to the Government sufficient information to
satisfy the Government as to the legitimacy of any and all sources of
such funds.  For the avoidance of doubt, neither Red Granite nor any
potential financier is required to seek such confirmation from the
Government, but may do so at their sole election.

35.  With regard to the Covered Conduct, the United States
likewise agrees to hold harmless any studio, distributor, trade
vendor, Union Entity, professional firm, or any other person as a
result of engaging in ordinary-course business dealings with Red
Granite.  For the avoidance of doubt, such ordinary-course business
dealings expressly includes but is not limited to the remittance of
payments by any motion picture studio or taxing authority in
accordance with the provisions below.

36.  Notwithstanding any provision to the contrary, the hold
harmless provisions of the Agreement apply purely prospectively, and
do not release any individual or entity for historical conduct.

37.  However, subject to Paragraph 38, certain financial
institutions, studios, distributors, trade vendors, Union Entities,

professional firms, and other third parties that may have relied upon the prior orders in the Actions holding them harmless in connection with their business with Red Granite (*i.e.*, the Collections Orders, as defined below) may continue to rely on those orders, whose hold harmless provisions remain in full force and effect.

38.  For the avoidance of doubt, nothing in this Agreement relieves any financial institution, as defined in Paragraph 34, of their obligation to monitor transaction activity in accordance with their obligations under the Bank Secrecy Act, comply with anti-money laundering laws (including 18 U.S.C. §§ 1956 and 1957), and file Bank Secrecy Act reports, as appropriate and in the ordinary course of that financial institution's business.  No financial institution shall be required to file Bank Secrecy Act reports for ordinary-course transactions involving Red Granite or its Shareholders, or to otherwise file any Bank Secrecy Act reports, solely because Red Granite or its Shareholders are a party to a transaction.

Third Parties Permitted to do Business

39.  All third parties are permitted to continue making payments to, receiving payments from, and doing business with Red Granite under any agreements that were executed on or before September 14, 2017, or which may be executed between September 14, 2017, and the date on which Red Granite completes payment of the Forfeiture Amount, and were disclosed explicitly to the Government, subject to the hold-harmless provisions.

40.  For the avoidance of doubt, and without limiting the scope of either the above language or the language of the hold-harmless provisions (*i.e.*, paragraphs 34-38):

a.   Any studio, distributor, trade vendor, professional firm,

21

or trade organization is permitted to make payments to and do business with Red Granite, subject to the hold-harmless provisions, including but not limited to Paramount; Universal Pictures, a division of Universal City Studios LLC; Sony Pictures Entertainment; Twentieth Century Fox Film Corporation; Warner Bros. Entertainment Inc.; Lions Gate Films Inc.; the Screen Actors Guild-American Federation of Television and Radio Artists; the Directors Guild of America, Inc.; the Writers Guild of America West, Inc.; the Writers Guild of America East, Inc.; the International Alliance of Theatrical Stage Employees; the International Brotherhood of Teamsters Studio Transportation Drivers; and the Motion Picture Industry Pension and Health Plans;

b.   Any financial institution, as defined in Paragraph 34, that provides banking services of any kind to Red Granite or its Shareholders, in their corporate or individual capacities, is expressly permitted to do so, subject to the hold-harmless provisions.

41.   Notwithstanding anything else in this Agreement, other than what is required by existing law or regulations, this Agreement imposes absolutely no prohibition, restriction, or limitation whatsoever on any third party's right or ability to conduct business with Red Granite.  Neither the Court nor the Government have imposed any prohibition, restriction, or limitation on Red Granite's business or the right or ability of third parties to conduct business with Red Granite.  No such prohibition, restriction, or limitation should be implied from the Actions, the Complaints, or this Agreement.

<u>Payments by Third Parties</u>

42.  For the avoidance of doubt, with regard to the Covered

Conduct:

        a.    All third parties obligated to pay proceeds from "The
Wolf of Wall Street" and "Dumb and Dumber To" into the
Collection Account (as defined in the Court's orders
dated August 16, 2016 [ECF No. 30], and July 7, 2017
[ECF No. 114] in case number 16-cv-5362-DSF (PLAx),
and the substantially identical order in case number
17-cv-04439-DSF (PLAx) (collectively, the "Collections
Order")) are expressly permitted and (subject to the
limits of this Court's jurisdiction) ordered to do so
without interruption, subject to the hold-harmless
provisions and the terms of this Agreement; such third
parties may include but are not limited to Paramount
Pictures Corporation; Universal Pictures, a division
of Universal City Studios LLC; and any taxing
authority.

        b.    All third parties obligated to pay proceeds from
"Friends With Kids" into the FWK Collection Account
(as defined in the Collections Order) are expressly
permitted and (subject to the limits of this Court's
jurisdiction) ordered to do so, subject to the hold-
harmless provisions and the terms of this Agreement;
such third parties may include but are not limited to
Lions Gate Films Inc.; and any taxing authority.

        c.    All third parties obligated to pay to Red Granite or
its assigns (including, without limitation, collateral

23

assignees) the proceeds of motion pictures other than "The Wolf of Wall Street," "Dumb and Dumber To," or "Friends With Kids" (including, without limitation, "Horns," "Out of the Furnace," "Daddy's Home," and "Papillon"), including but not limited to Paramount Pictures Corporation, are expressly permitted and (subject to the limits of this Court's jurisdiction) ordered to do so subject to the hold-harmless provisions and the terms of this Agreement, and Red Granite or its assigns (including, without limitation, collateral assignees) are permitted to receive such proceeds.

43.   Any restraints imposed by the Collections Order, including with respect to the Collection Account and the FWK Collection Account are dissolved.  For the avoidance of doubt, Fintage Collection Account Management B.V. may release any funds from the Collection Account and the FWK Collection Account due to Red Granite, pursuant to the terms of any applicable Collection Account Management Agreement(s).

Binding Effect; Benefits

44.   The Agreement shall be binding upon and inure to the benefit of each of the parties and their successors and assigns.

Court Approval; Good Faith

45.   Notwithstanding any provision to the contrary, this Agreement is expressly subject to and contingent upon approval of the Court.  If this Agreement, or any portion thereof, is rejected by the Court or is overturned or modified on appeal, the Parties agree to negotiate in good faith to revise the terms of the Agreement such

1  that it can be approved.

2     46.   During any period that the Agreement is not in force,

3  neither the Agreement nor any negotiations or writings in connection

4  therewith shall in any way be construed as or deemed to be evidence

5  of an admission on the part of any Party regarding any claim, right,

6  or defense that such Party may have against any other Party.

7     47.   Notwithstanding the previous paragraph, any third party is

8  entitled to reasonably rely on the hold-harmless provisions for

9  actions taken while the Agreement is not in force.

10  <u>Miscellaneous</u>

11     48.   The Parties agree that the settlement of this matter upon

12  the terms and conditions set forth in this Agreement shall be the

13  final and complete satisfaction of the claims asserted by the United

14  States and Red Granite.   Red Granite understands and agrees,

15  individually and jointly, that it will not seek, through any court

16  proceeding or other process, the return of the Forfeiture Amount

17  except as otherwise provided herein.   Except as otherwise provided

18  for in this Agreement, the Parties specifically waive any rights to

19  further litigate against each other their respective interests in the

20  Forfeiture Amount or to petition for remission or mitigation of the

21  settlement, releases, or forfeiture.

22     49.   All Parties shall bear their own fees and costs.   The

23  Parties hereby waive any and all claims for attorney's fees and

24  costs.   For the avoidance of doubt, notwithstanding the provisions of

25  Title 28, United States Code, Section 2465, or any other "cost" or

26  "fee-shifting" statute or regulation, Red Granite expressly waives

27  any right to seek any fees or expenses incurred by Red Granite

28  related to the seizure and/or forfeiture of the Defendant Assets.

50.   Red Granite expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for Red Granite issue any press release contradicting or that is inconsistent with the consent judgment and this Agreement.  At least 48 hours prior to any Red Granite press release related to the consent judgment, Red Granite agrees to provide to the Government an advance copy of such press release.

51.   Each of the signatories to this Agreement represents that he or she has the full power and authority (without further approvals or consents) to enter into this Agreement and bind the relevant Party or Parties.

52.   This Agreement may be signed in counterparts and shall be deemed to have been equally drafted by the Parties hereto.

53.   The signatories to this Agreement acknowledge that they are, and have been, represented by competent counsel in connection with the negotiation, preparation, and execution of this Agreement and the legal effects thereof have been explained to them, and that they are entering into this Agreement freely and voluntarily, without coercion, duress or undue influence.

54.   This Agreement, and any dispute arising thereunder, shall be governed by the laws of the United States and the laws of the State of California.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement is the United States District Court for the Central District of California.  This Court shall retain jurisdiction to enforce this Agreement.

55.   In the event that any disputes arise about the

interpretation of or compliance with the terms of this Agreement, the Parties will endeavor in good faith to resolve any such disputes between themselves before bringing it to the Court for resolution. However, in the event of either a failure by one of the Parties to this Agreement to comply with its terms or an act by one of the Parties in violation of any provision hereof, the Parties may move this Court to impose any remedy authorized by law or equity.

56.   This Agreement constitutes the entire final, complete and exclusive agreement and understanding between and among the Parties and supersedes all prior or contemporaneous written or oral agreements.   The Parties expressly acknowledge that they have not relied on any representations, warranties, agreements, or understandings not expressly contained in this Agreement.   There shall be no modification of the Agreement unless in writing and signed by all the undersigned Parties or their authorized representatives, *provided, however*, that the signature of a representative of the Union Entities and/or Paramount shall not be necessary to modify this Agreement unless the proposed modification would have the effect of impairing any rights the Union Entities and/or Paramount may have or assert.

**SO STIPULATED.**

Dated: March 6, 2018

Respectfully submitted,

DEBORAH CONNOR
Acting Chief, MLARS

NICOLA T. HANNA
United States Attorney

_/s/John J. Kucera_
JOHN J. KUCERA
JONATHAN GALATZAN
Assistant United States Attorneys

WOO S. LEE
Deputy Chief, MLARS
JONATHAN BAUM
BARBARA LEVY
Trial Attorneys, MLARS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Dated: March 6, 2018

_/s/ (by e-mail confirmation)_
MATTHEW L. SCHWARTZ
JAIME SNEIDER
DAVID L. ZIFKIN
BOIES SCHILLER FLEXNER LLP

Attorneys for Red Granite

AGREED AND STIPULATED SOLELY
AS TO PARAGRAPHS 2-6, 9, 17,
24, 33-47, and 51-56


Dated: March 6, 2018

/s/ (by e-mail confirmation)
JOSEPH A. KOHANSKI
DAVID E. AHDOOT
BUSH GOTTLIEB

Attorneys for the Union Entities

AGREED AND STIPULATED SOLELY
AS TO PARAGRAPHS 2, 5, 8(c),
8(d), 24, 35-39, 42-43, 45-
47, and 51-56


Dated: March 6, 2018

/s/ (by e-mail confirmation)
RICHARD KENDALL
KENDALL BRILL & KELLY

Attorneys for Paramount